May it please the court, Ezekiel Cortez on behalf of Dr. Harshad Shah. It seems that entrapment is in the air this morning. It also seems as though, like the prior case, a lot of issues before this court this morning would be perfect for law review articles, but we don't have that luxury. So with that, in the rain outside, let me first say that I was not trial counsel. And sometimes we have a tendency to second-guess our own colleagues. But in this case, it's pretty clear what happened. Facts are very simple. There were two trials in this case. In both trials, there was a defense of entrapment. In both trials, the government, on opening statement and on direct examination of the agent Raghavan, brought out for predisposition purposes, not for any other reason. It's in the transcript, for predisposition purposes, that the first agent, at the very answer, that to her meant, oh, and make the audit go away. But didn't he, your client, initiate the conversations about their ethnicity? And that's what the district court found, Your Honor. You're absolutely right. But as we briefed, you know. It's kind of like he was saying, you and I are from India. We're both Hindu. And so. Absolutely. And he was talking in Hindi, and she was answering in English. Yes. And that's what the district court noted. So who started the ethnic background in this case? Dr. Shah, but Your Honor. All right. Judge Bail, Judge Drain. That thankfully for me is not the issue before this court, is it? Well, that's. An issue before this court. One of the things that you've raised is the intentional introduction of racist testimony. Well, that racist part. And I'll refer to the government's reply brief, because the same thing happened with the district court. The issue is not whether my client, Dr. Shah, initiated an ethnic discussion. The issue is whether he introduced to the jury that in India, there's a lot of corruption that goes on there, to quote Agent Raghavan. Dr. Shah did not initiate that discussion. And the discussion that came in front of the jury went beyond what Dr. Shah initiated. And that's what's before this court. Whether an opening statement, a direct examination of an official witness, Agent Raghavan, the because they're brother and sister from India. And in India, it's like a syllogism. And in India, there's a lot of corruption that goes on there. She felt by that, that he was giving her a bribe. Didn't he do the same thing with the other one who has been seen as a psychiatrist and they tried to find common ground with that agent as to the practice of psychiatry since he was a psychiatrist? Yes, Your Honor, Reverend Agent Hamm. It was the other way around. Well, he's the psychiatrist, right? Absolutely. And it was the agent in that situation in June, May and June 2009. It was the agent, not Dr. Shah, who because Dr. Shah was a psychiatrist, offered that he had suffered major problems of depression, that he had suffered a lot of psychological issues. It was the agent who began that government council characterizes that discussion as facilitating the dialogue between the two. But to get back to the issue of racist comment, it is not the issue before this court, factual or legal. In fact, we conceded that Dr. Shah started the discussion about being from India both. That's not the animus that is before this court. What is? What is? The animus is that a trial in front of the jury, the government took that initial discussion that could be characterized as innocent and added one element, the toxin. And on opening statement and direct examination, the government offered the additional point that because in India, it was an opinion, because in India, corruption was rampant, a lot of corruption goes on there. Because of that opinion, then Dr. Shah saying, please make the audit go away. She felt that was a bribe that was offered to her. Is there an objection to that? No, it's not. And I will, you asked earlier, Judge Wardlaw, does it make a difference whether we apply a structural error, a plain error analysis? In this case, it doesn't, because it involves the same concept, and we are claiming structural error to be very direct. But it really practically, there are some issues in trials that affect the public perception, the very requirement of plain error. It also goes to structural error, the very perception of the trial, of the fairness of a trial, the very fairness of a jury that is untampered by unacceptable notions of racism. But don't lawyers have a responsibility and they have to object and they have to make a record? And so many of these issues that you've raised, there were no objections to these matters at trial. And you know, it's a higher standard that applies when there's no objection at trial and things are raised for the first time on appeal. Absolutely. And the trial judge, the trial judge didn't have to deal with these issues. Absolutely. So it's just, it's just a higher burden. It is. And Judge Drain, thank you for that question, because one of the cases that we cited in our briefing, the Buck case, the Buck case was in post-conviction relief for 20 years, two decades. That's what the Supreme Court noted. And at every stage of the proceedings, the defense attorneys in that case waived or didn't raise the issues that were eventually before the Supreme Court. So at what point is it a tactical decision by a lawyer not to object? And at what point does it pass over and just simply a sacrifice to somebody's Sixth Amendment and due process right to a fair trial? I am keenly aware that no one objected. Indeed, it goes further, Judge Drain. In the second trial, having been unnoticed of what happened in the first trial, there were no pretrial objections, motions to exclude this type of opinion testimony. And it is the type of opinion testimony that is not just de minimis, as in a case that the government cited, for saying why the district court didn't have a so-esponsored duty to do something. This is a type of evidence, elicited directly by the government, that can affect every human being. And it's in the cases that we cited that raised issues that we raised in our briefs. This type of testimony, when clothed with the government's penumbra, if you will, by an official witness from the IRS, the court allowing it, the defense attorney is not objecting, and then being exploited at closing argument, then the jury begins to think, well, it's OK to say that when the issue, when the critical issue is whether Dr. Shaw is predisposed, then we could consider his Indian heritage. How could anyone say that? And so for a lawyer not to object, judge-trained, I do a lot of 2255 to 2254 work in my years. I've seen a lot of lawyers sit under thumbs and not object. Sometimes it's tactical, sometimes strategic, but many times they just fall asleep on the job. And I don't know why no one objected to this type of testimony. It is the type of testimony that you don't have to be told. We don't do that in America. In fact, to borrow from Raghavan, Agent Raghavan telling Dr. Shaw, you know, we don't do that in America. She was absolutely right. We also in America do not opine to a jury that because someone is from Detroit or Mexico or India, they happen to have a predisposition for something. I agree. If an objection had been made, and it could have been made on a number of grounds as to what happens in India, if it had been made, probably the evidence would have been excluded. But it wasn't made. Yes, Your Honor, it wasn't. And it should have been made. So we get to how do you evaluate first, and that's why I say there's no practical difference Under plain error, under structural error, you have to find first that there was error. Right, but then we have to look at the other three factors. And I guess one of the things that you look at is, so what was the next incident? And then so then there was another similar incident, and this didn't have anything to do with what happens in India. It had to do with the practice of psychiatry. So that's sort of a, you know, that reinforces that he was predisposed, not because of necessarily what happens in India, but just because he was predisposed. And that gets to the point of the jury instruction and the jury's question when they were deliberating. The jury asked the court, can we consider the tape recordings for predisposition? Well, with Revenue Agent Ham, Judge Wardlaw, there was a lot of interaction, including very intimate interaction about psychological problems, and for seven months, Judge Wardlaw, for seven months, number one, there was no tape recording. There was no reporting of any bribe. For seven months, no bribe was offered. And only after Revenue Agent Ham was told, finish the report, finish the report now, and told Dr. Shaw, you owe us $400,000, and the entire time he has all the bank records, the bank records, the Wells Fargo bank records, in his trunk of his car. Only after the bribe was offered, then the documents were provided. Why am I pointing? I don't understand that point either, because it seems to me that, why didn't he just do the audit? He wouldn't have had to pay $30,000 and the other amount, I mean, he only owed $134,000 to begin with. Yes. So. Thank you. I don't understand that either, because that's why we mentioned the Witherspoon, Agent Witherspoon email to Ham in October 2009. We mentioned it in our briefs. It is, if I can have a second, it is at ER 202, ER 202. Agent Witherspoon was a supervisor, and that was Trial Exhibit 63, Your Honors. Trial Exhibit, Defense Trial Exhibit 63. Why is that enlightening of these questions you're asking? Because Agent Witherspoon was a supervisor. She was a supervisor of Ham. Dr. Shaw had complained about having problems with Revenue Agent Ham. Okay? And so she comes in, and Agent Ham now needed, it's October 2009, he needs a time extension to finish the audit, so Dr. Shaw is not returning his phone calls. So what happens is Witherspoon then reaches out to Dr. Shaw, and Dr. Shaw speaks with her. This is a supervisor. Okay? In October 2009. And he basically tells her, no, no, and I'll pay my taxes, whatever I owe, I'm going to pay, and I will give you an extension. I will grant you the extension. And then she writes back to Ham and says, he will give us the extension. It is not his intent not to pay taxes. This is October 2009. Where's the predisposition? So you see, the reason why this case is very difficult, it was difficult for me, I had four months to prepare everything for sentencing, okay? And look at the trial record, how expansive it is. It's real simple. And this is the way I finally figured it out. So in March, May and June 2009, the IRS decides to do an audit of a doctor, a doctor with no prior incidents of anything. In June, Raghavan calls him and says, I'm doing your corporate taxes. No bribes offered to anyone until December 2009, nothing. But what you have between June, May and June 2009, and December, number one, no tape recordings, no bribes offered to anyone, evidence unimpeachable from Witherspoon that Dr. Shah wanted to pay whatever he owed. She quoted him. This is in October. So when you have nothing, no objective evidence from a target of any predisposition, this is the exact opposite of the Black case, this court's Black decision. In Black, this court found plenty of evidence of immediate predisposition. This is the exact opposite. You have a lot of contact with revenue agents, no bribes are being offered, yet there's a lot of fight about record production, deductions, and all that kind of stuff. So do we really want to have an individual like Dr. Shah with no prior history of anything illegal? There's nothing in the record, nothing. Up to October 2009, still nothing. And then when he's told, you owe us almost half a million dollars in taxes, what does he say? Mike, this is him, Mike, you're killing me. Of course, that's the entrapping conduct. The oddest thing is there's no, I mean, the bribe was to get the taxes down to $150, when in actuality they were only $134. And that's why Witherspoon said he wanted to pay his tax liability. There was no need for a bribe. There was no need to not pay $150. It's finally, it's finally made. Yes, I think insistence of him. In the record, we provided the court how Ham is talking to Gomez, the criminal guy, I can get him to pay more. I can get him to, I can get him to do that. And Ham admitted that his goal was to get Dr. Shah to offer a bribe. And he kept upping the ante. So yes, Your Honor, in every case where there's an entrapment, this court has seen too many. When you start tape recording a target, after that target has been warmed up properly, of course, there are going to be confessions to crimes, there's going to be criminal conduct, and it's going to be incriminating. But that's what we have entrapment. The actual conduct here is between May 2009 and November 2009. And unfortunately for the jury, when they ask, can we consider the tape recordings, that is the orchestrated tape recordings, can we consider that as evidence of predisposition? And here's the key. Before an official from the government contacted the defendant, well, the court should have said, well, yes, you can, but in the light of all the other evidence, beginning with May 2009. Because that's the period of time when the defense and the theory of the defense was this man was entrapped by him in the context of a psychiatric consultation, ongoing psychiatric consultation. Counsel, you're over your time. I'm sorry. Let's hear from the government. Thank you. Good morning, Your Honors. Jennifer Ware on behalf of the United States. A minute, please, the court. The court should affirm defendant's conviction and 51-month sentence in this case. The case largely relies on defendant's own statements. And while defense counsel or counsel for Shaw says that there was entrapment, the tapes clearly show that there were not. Defendant told revenue agent Ham, I'm giving you the greatest opportunity of your life. You are working for me now. He even goes on to say that if he was an IRS revenue agent, he would have accepted bribes. Revenue agent Ham told the defendant 14 separate times that what he was doing was illegal, yet the defendant proceeded anyway. You have to speak up, ma'am. Yet the defendant proceeded anyway. The defense counsel has made much to do about revenue agent Raghavan's testimony at the trial. Revenue agent Raghavan came to the trial and testified that the defendant said to her, and he started talking to her in Hindi, asked her where she grew up based on her accent. When she told him that she was from New Delhi, he then talked to her in Hindi and said, you are my brother. I am your brother. You are my sister. Let's make this audit go away. She interpreted those words and the context in which they were said and the way that they were said as a bribe overture. In fact, she said to the defendant, this is America. We must go along with the audit. Defendant didn't contest those words. And she was so distraught and so shocked, her testimony was, that she asked to be removed from the audit. But there wasn't any money mentioned. The only thing that was mentioned was their common ethnic background and his overture that they were brothers and sisters. Perhaps he was asking for a break based on affection. Right, which is why it's, well, he also said there was so much going on in this world. There's no, he didn't offer her any money, did he? And that's not what her testimony was about. Her testimony was showing that it was an overture to make it go away for the predisposition aspect for entrapment. That's what it was offered for. Make it go away. You interpret that as a predisposition to give a bribe rather than a predisposition to perhaps use ethnic basis as leverage for sympathy or affection. Right, which that sympathy shows that it was never defendant's intention to pay taxes, as opposed to what defense counsel just argued, and shows that he was predisposed to ask the revenue agent to make it go away. He was going to play on the ethnic commonalities to say, hey, there's so much going on in this world, started talking to her handy to make it go away, and the revenue agent interpreted that as a bribe overture. That's her testimony. And there was no objection to that testimony? There was absolutely no objection, and in fact, on cross-examination, the defense used that testimony, asked all about different areas of India, and even in closing argument, called the government inappropriate, and capitalized on that testimony. On the other hand, I did the closing argument in that case, I never mentioned it one time. I never once mentioned those words that the revenue agent stated. Therefore, there was no error in revenue agent Raghavan's testimony, and more importantly, it was definitely not clear or obvious. And moreover, there was no prejudice, as there was overwhelming evidence of defendant's guilt, as shown on the tapes. If there are no other questions, I'll submit. I don't know, I'm just a little curious about how someone's tax liability goes from $400,000 down to $130-some-thousand. Your Honor, I was pointing out by revenue agent Yu, the defendant, after trying to pay the $30,000 bribe, and it not, obviously, panning out the way he wanted it to, decided to actually follow the rules, and hire an accountant, who then put together, using QuickBooks and all the receipts, put together the books and records. That caused 75% of the difference between the original tax, and what ultimately was determined by the IRS that the defendant owed. So, in other words, the IRS scares the pants off the man with $400,000, and then hires somebody to actually do the figures, and then come down to $134,000? The record does not support that the defendant here was scared out of his pants by the IRS. In fact... He said, you're going to kill me? That's pretty scary, don't you think? Well, he also said in that same exact conversation, you are going to work for me, and you're going to work for me now. Not with... Oh, go ahead. On January 5th, in the recorded conversation, Dr. Shaw told the revenue agent, you are working for me now. And he also told him, subsequently, that I'm giving you the greatest opportunity of your life. It just seems so unnecessary, this whole thing to happen. And so, I mean, to me, it casts a question as to predisposition. Whether he... I don't know. Whether that would have been his choice to pay a bribe. I mean, why would one make that choice, as opposed to just getting your own lawyer and doing your own review of the records to see how much you thought you really owed? Because the defendant thought he could get away with it. And that's what he said in the tapes. He basically said, I don't want to do that work. I'd rather pay you. That's what he said in the recording. Okay. Can you give me a citation to where he said that? Yes, one moment. Your Honor, rather than waste of time, I can submit that after the argument. Okay. That'd be good. Thank you. Any other questions? Does anybody have any other questions? No, I think what you're talking about is that the GER 54. Now, wait a second. You gave me the tax. You, in other words, just so I'm clear, I'm not putting this $30,000 as Ham toward anything related to the IRS. This money is for me. Dr. Shah responded, of course. Ham noted, well, you were saying that you paid the tax. Dr. Shah said, I was kidding. I didn't pay it, but I paid you. That's what you were looking at. Yes. Thank you. That's GER 54 and 55. Thank you, Justice Beyer. Okay. Thank you. May I have a moment? Yes. Two things. In that exhibit you found, Judge Beyer, comes from the January phone Not before January. That's critical. By that point, he was already in dialogue with Ham. But, number one, the government just told you, and I try to develop this theme in our brief. The government just told you. She did the closing argument. She did. And she didn't refer to Raghavan's testimony. She just told you that. I refer you to page 159 of the transcript, trial transcript. Lines 14 through 19, where she specifically mentions Raghavan's commonality with India, how he was finding a way into her, and how he was trying to get her to make the audit go away. He was exploited in the closing argument. I don't know why counsel tells you it wasn't. It's right there. Second. I think, to be fair, she was saying she didn't exploit the testimony about bribery being rampant in India. No, because that already had been set for the jury. She said she didn't take advantage of that. Well, that could be an interpretation. In closing. I understand. That could be an interpretation. She introduces it on opening, on direct examination, and then adds a little bit in passing, at closing. But then you get back to that wonderful quote. But before I give you the quote, and I'll shut up then, I'd like to refer you again to Witherspoon's exact words. Counsel just told you that I'm saying he wanted to pay his taxes, and that's not true. Here's a direct quote, and it's in the transcript, and it's in the exhibit. This is October 2009 email at ER-202, ER-202, where Witherspoon is telling him it was not his intention not to pay taxes. I didn't just invent it. It's right there in the transcript. So the issue, as we get to some poisons are toxic in small quantities. What's in this trial, and it touches almost every issue, is the government intentionally elicited the second part of Raghavan's opinion about what Shaw told her. Shaw didn't tell her, hey, we're from India. We bribe a lot of people there. Can I bribe you? He didn't do that. He didn't raise that. When you go to a jury trial and you have some testimony like that, number one, if you're a defense attorney, you bring a motion for exclusion. There were many bases to exclude it. The defense attorneys didn't do it. How could that be a strategic decision? Then the government brings it in. For what purpose? The central issue for the jury. The central issue for the jury was, was Dr. Shaw predisposed before government contact? That was the central issue for this jury. If you're going to allow juries to consider someone's ethnicity as a propensity, which the Supreme Court has said, no, you cannot. Especially, and even when the defense attorneys don't object, and as in one case, when the defense attorney brings it out of their own witness. That doesn't excuse this type of conduct. We don't do that in America, to quote Agent Raghavan. Thank you, counsel. Thank you. United States v. Shaw.
judges: Wardlaw, Bea, Drain